# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 25-638


JAKE CARMOUCHE, ET AL.

VERSUS

NATIONAL UNION FIRE INSURANCE COMPANY
OF PITTSBURGH, PA, ET AL.


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NUMBER 2022-9627B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## GARY J. ORTEGO
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Candyce G. Perret, Charles G. Fitzgerald, and Gary J. Ortego, Judges.

### AFFIRMED IN PART; AND REVERSED IN PART.

**Perret, J.,** concurs and assigns reasons.

**Fitgerald, J.,** dissents, in part, and assigns reasons.

**Daniel G. Brenner**
**Bolen, Parker, Brenner, Lee & Miller, LTD.**
**709 Versailles Boulevard**
**Alexandria, LA 71315-1590**
**(318) 445-8236**
**COUNSEL FOR DEFENDANTS/APPELLANTS:**
**Bayou Ready Mix, LLC**
**Gene Adam Lemoine**

**Robert I. Siegel**
**Morgan A. Druhan**
**Laborde Siegel, LLC**
**701 Poydras Street, Suite 4800**
**New Orleans, LA 70139-4800**
**(504) 561-0400**
**COUNSEL FOR DEFENDANT/APPELLANT:**
**National Union Fire Ins. Co.**

**Jerold Edward Knoll**
**Jerold Edward Knoll, Jr.**
**Aaron Broussard**
**Laura B. Knoll**
**Broussard Knoll Law Firm**
**1301 Common Street**
**Lake Charles, LA 70601**
**(337) 439-2450**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
**Jake Carmouche, et al.**

**ORTEGO, Judge.**

Defendants, Gene Lemoine, his employer, Bayou Ready Mix, LLC, and Bayou Ready's insurance company, National Union Fire Insurance Company of Pittsburgh, PA, appeal the jury verdict and denial of their motion for a judgment notwithstanding the verdict ("JNOV"). For the following reasons, we affirm in part and reverse in part.

## FACTS AND PROCEDURAL HISTORY

On November 22, 2021, Katie Carmouche ("Katie") and her three minor children were involved in a motor vehicle accident, which caused serious injuries to Katie, Cole, Bennette, and resulted in the death of the Carmouches' daughter, Hayzel.

The accident occurred shortly before 8:00 am when Katie was on her way to drop off her three children at daycare. All three children were riding in the back seats—Hayzel was eight years old, Cole was five years old, and Bennette was two years old.

While stopped in the northbound lane of Highway 1 waiting to make a left turn into the daycare facility, a cement truck rear-ended Katie's car at a high rate of speed. The impact crushed the rear of Katie's car and propelled her vehicle into the southbound lane, where it was hit once again by an oncoming Ford F-150. The damage to the car was so extensive that the back seats were forcibly shoved into the front seats and the front seats were shoved into the dashboard. The children's daycare operator witnessed the accident from the facility and immediately called Katie's husband, Jake Carmouche ("Jake"), and 911.

At some point after the damaged car came to a stop, Katie was able to exit the vehicle and attempted to get her children out. A retired nurse who had driven by the scene shortly after the accident pulled over to aid the family. Bennette and Cole

were eventually extricated from the car with difficulty, as a result of extensive damage to the car's frame. Hayzel, on the other hand, was wedged too tightly between the front and rear passenger seats to be removed without specialized equipment.

Jake, who was trained as an army national guard medic/EMT, arrived within minutes of the accident. He attempted to remove Hayzel from the vehicle to no avail. The first responders arrived shortly thereafter, and the "jaws of life" had to be used to extract Hayzel from the car. Prior to Hayzel's removal from the car, Jake and the other first responders attempted to revive Hayzel with a defibrillator, but these efforts were abandoned when it was discovered Hayzel no longer had a pulse, and she was officially pronounced dead at the scene.

While Jake and the first responders were attending to Hayzel, Katie and the two boys were lying in a ditch. Cole was slipping in an out of consciousness as a result of a severe head injury and Bennette was screaming in pain as a result of leg fractures.

Katie and the two boys were transferred to Rapides Regional Medical Center for treatment. The record reflects that Bennette had suffered a broken tibia and fibula, which required him to wear a long-leg cast and not put any weight on the leg for weeks. Cole suffered an "open depressed skull fracture with underlying subdural hematoma," which was diagnosed as a "severe traumatic brain injury." He exhibited signs of a brain injury for six months.

Jake and Katie, individually and on behalf of their minor children (collectively referred to as "plaintiffs"), filed a petition for damages naming the driver of the cement truck that rear-ended Katie's car, Gene Lemoine, his employer, Bayou Ready Mix, LLC, and Bayou Ready's insurance company, National Union Fire Insurance Company of Pittsburgh, PA, as defendants (collectively referred to as "defendants").

2

On April 13, 2023, the trial court granted the plaintiffs' motion for partial summary judgment on the issue of liability, finding the driver of the cement truck "solely at fault" for the accident.

Following a four-day trial on the issue of damages, on February 7, 2025, the jury returned a verdict awarding the plaintiffs over $34 million total in general damages, which encompassed the pain and suffering experienced by the family, bystander trauma, and the wrongful death of Hayzel. The jury verdict and awards were broken down as follows:

| 1.KATIE CARMOUCHE: | |
|---|---|
| a) Stipulated Medical Bills | $128,180.89 |
| b) Past Physical Pain and Suffering | $100,000.00 |
| c) Past Mental Pain and Suffering | $7,000,000.00 |
| d) Future Mental Pain and Suffering | $3,000,000.00 |
| e) Loss of Enjoyment of Life | $50,000.00 |
| f) Physical Disability | $0.0 |
| g) Mental Anguish and Emotional Distress As a result of Witnessing Injury and Death to Hayzel Carmouche | $1,000,000.00 |
| h) Mental Anguish and Emotional Distress as a result of Witnessing Injury To Cole and Bennette Carmouche | $100,000.00 |
| i) Loss of Consortium and Society with Cole and Bennette Carmouche as a Result of Physical and Emotional Injuries Sustained by Cole and Bennette Carmouche | $100,000.00 |
| j) Loss of Consortium and Society with Jake as a Result of Physical and Emotional Injuries sustained by Jake Carmouche | $0.0 |
| k) Damages for the wrongful death of Hayzel Carmouche | $15,000,000.00 |
| Total damages to Katie Carmouche | $26,492,591.37 |
| | |
| 2. JAKE CARMOUCHE | |
| a) Stipulated Medical Bills | $1,407.87 |
| b) Mental Anguish and Emotional Distress As a result of witnessing injury and death to Hayzel Carmouche | $3,000,000.00 |
| c) Mental Anguish and Emotional Distress As a result of witnessing injury to Cole Carmouche and Bennette Carmouche | $50,000.00 |
| d) Loss of Consortium and Society with Cole and Bennette Carmouche as a Result of hysical and Emotional Injuries sustained by Cole and Bennette Carmouche | $0.00 |
| e) Future Mental Pain and Suffering | $250,000.00 |
| f) Funeral Expenses – Hayzel Carmouche | $14,410.48 |
| g) Damages for the wrongful death of Hayzel Carmouche | $5,000,000.00 |
| Total damages to Jake Carmouche | $8,315,818.35 |
| | |

3

| | |
|---|---|
| 3. JAKE CARMOUCHE and KATIE CARMOUCHE, on behalf of their minor child, Cole Carmouche, | |
| a) Stipulated Medical Bills | $211,556.68 |
| b) Physical Pain and Suffering | $100,000.00 |
| c) Past Mental Pain and Suffering | $25,000.00 |
| d) Future Mental Pain and Suffering | $0.00 |
| e) Physical Disability | $0.00 |
| f) Loss of Consortium and Society with Katie Carmouche | $0.00 |
| g) Loss of Consortium and Society with Jake Carmouche | $0.00 |
| Total damages to Jake and Katie Carmouche, on behalf of Cole Carmouche | $336,556.68 |
| | |
| 4. JAKE CARMOUCHE and KATIE CARMOUCHE, on behalf of their minor child, Bennette Carmouche: | |
| a) Stipulated Medical Bills | $87,860.32 |
| b) Physical Pain and Suffering | $100,000.00 |
| c) Past Mental Pain and Suffering | $25,000.00 |
| d) Future Mental Pain and Suffering | $0.00 |
| e) Physical Disability | $0.00 |
| f) Loss of Consortium and Society with Katie Carmouche | $0.00 |
| g) Loss of Consortium and Society with Jake Carmouche | $0.00 |
| Total damages to Jake and Katie Carmouche, on behalf of Bennette Carmouche | $212,860.32 |
| | |
| 5. Under Louisiana Civil Code article 2315.1, the Jury was submitted the following interrogatory:<br><br>**Do at least nine of you agree that Hayzel Carmouche experienced conscious pain or fear prior to her death?**<br><br>To which the Jury responded as follows:<br><br>_____ YES       \_\_\_\_x\_\_\_ NO | |

Defendants moved for a "JNOV" on February 28, 2025, arguing the damage award was too high. The trial court denied the motion on April 8, 2025, finding that the verdict was supported by the "special" facts and circumstances of this case.

Defendants timely perfected a partial suspensive appeal on May 7, 2025.

4

## ASSIGNMENTS OF ERROR

Defendants allege:

1. The jury abused its discretion in awarding Jake $5 million and Katie $15 million for the wrongful death of their daughter, Hayzel Carmouche.

2. The jury abused its discretion in awarding Jake $3 million and Katie $1 million for mental anguish and emotional distress as the result of witnessing the death of their daughter, Hayzel Carmouche.

3. The jury abused its discretion in awarding additional pain and suffering damages—$250,000 to Jake and $10.1 million to Katie—separate and apart from their wrongful death and bystander recoveries.

## STANDARD OF REVIEW

The trier of fact has much discretion to assess facts and render an award because it is in the best position to see the evidence firsthand and evaluate witness credibility. *Jeffries v. Prime Ins. Co.*, 21-161 (La.App. 3 Cir. 11/3/21), 334 So.3d 761, *writs denied*, 21-1811, 21-1817 (La. 2/22/22), 333 So.3d 433. The appellate court must bear "in mind that if a trier of fact's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently." *Mistich v. Volkswagen of Ger., Inc.*, 95-939, p. 5 (La. 1/29/96), 666 So.2d 1073, 1077. "[T]he issue to be resolved is not whether the trier of fact was wrong but whether the factfinder's conclusions were reasonable." *Id.* To reverse a factfinder's determination, the Louisiana Supreme Court has a two-part test: "(1) [t]he appellate court must first find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the factfinder is clearly wrong (manifestly erroneous)." *Id.* at 1077–78.

"The standard of review applicable to a general damages award is the abuse of discretion standard. The trier of fact is afforded much discretion in assessing the facts and rendering an award because it is in the best position to evaluate witness

5

credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459 (citation omitted). "General damages are inherently speculative [and] cannot be calculated with mathematical certainty[.]" *Baack v. McIntosh*, 20-1054, p. 10 (La. 6/30/21), 333 So.3d 1206, 1214. The jury has abused its discretion when the general damages verdict is high enough or low enough in proportion to the harm done that it shocks the conscience. *Riley v. Maison Orleans II, Inc.*, 01-498, (La.App. 4 Cir. 9/25/02), 829 So.2d 479, *writs denied*, 02-2646, 02-2653 (La. 12/19/02), 833 So.2d 345.

## LAW AND DISCUSSION

Because defendants' assignments of error all relate to the amount of damages, specifically, the amount of the wrongful death awards to Jake and Katie, the bystander awards to Jake and Katie, and the pain and suffering awards to Jake and Katie, these damages will be largely addressed together, as "a court does not review a particular item in isolation, rather, the entire damage award is reviewed for an abuse of discretion[.]" *Pennison v. Carrol*, 14-1098, pp. 14-15 (La.App. 1 Cir. 4/24/15), 167 So.3d 1065, 1078. Furthermore, the arguments related to each assignment of error frequently overlap.

We will first review the arguments made by the parties before we conduct our analysis.

*Defendants' Arguments*

Essentially, defendants argue that the damage awards should be reduced because the amount is in excess of awards in similar cases, and that allowing such a verdict to stand would create limitless financial consequences for ordinary negligence and liability exposure that no individual or business could reasonably anticipate or insure against.

6

Defendants suggest *Pete v. Boland Marine & Manufacturing Co., LLC*, 23-0170 (La. 10/20/23), 379 So.3d 636, is the applicable legal precedent, wherein the supreme court stated that where there is a vast disparity between a general damages award in one case and the ones awarded in cases with similar facts, the jury has abused its discretion and reviewing courts should adjust the award to the closest point within the permissible range of juror discretion.

*Wrongful Death Awards*

Defendants argue that this court established a $2 million ($2.7 million adjusted for inflation) ceiling on general damages for the wrongful death of a child in *Renfro v. Burlington Northern Santa Fe Railway Co.*, 15-372 (La.App. 3 Cir. 5/11/16), 193 So.3d 1192, wherein a train struck a vehicle attempting to cross the railroad tracks and killed the 17-year-old driver of the vehicle. The jury initially awarded a verdict in excess of $6 million, but this court stated that $2 million would "be the highest reasonable amount of general damages that could have been awarded in this case." *Id.* at 1210. Defendants also cite *Hutto v. McNeil-PPC*, 11-609 (La.App. 3 Cir. 12/7/11), 79 So.3d 1199, *writ denied*, 12-402 (4/27/12), 86 So.3d 628, *cert. denied*, 568 U.S. 959, 133 S.Ct. 428, 184 L.Ed.2d 289 (2012). wherein plaintiffs' five-month-old daughter died of liver failure as a result of incorrect acetaminophen dosing instructions from the hospital. The parents were awarded $1 million each for pain and suffering, and $1 million each for the wrongful death of their child.

Defendants further contend that the third circuit's $2 million dollar ceiling set out in *Cox v. Moore*, 01-878 (La.App. 3 Cir. 12/12/01), 805 So.2d 277,[1] was out of

---

[1] In *Cox*, a young mother was involved in a fatal car crash that killed her eleven-year-old daughter. The mother received over $1.4 million in general damages, with $750,000 being awarded for physical and mental pain and suffering, as well as $500,00 for the wrongful death of her child and a bystander award for witnessing her daughter's brutal last moments of $150,000.

7

step with the other circuits, in that the award was relatively high. Defendants cite *Rideau v. State Farm Mutual Auto Ins. Co.*, 06-0894 (La.App. 1 Cir. 8/29/07), 970 So.2d 564, *writ denied*, 07-2227 (La. 1/11/08), 972 So.3d 1168, wherein the first circuit held that $575,000 was the highest amount the jury was within its discretion to award for the wrongful death of a mother's ten-year-old only child in a car accident. Defendants further argue that the supreme court, in *Anderson v. New Orleans Public Service Inc.*, 583 So.2d 829 (La. 1991), decreed that $325,000 (about $800,000 adjusted for inflation) was a per se excessive wrongful death award to a mother who lost her three-year-old son in a car accident. Additionally, the defendants cite *Tingle v. American Home Assurance Co.*, 10-0071 (La.App. 3 Cir. 6/2/10), 40 So.3d 1169, wherein this court found that $2 million was an abuse of discretion when a two-year-old died in a car accident caused by a negligent driver and reduced the wrongful death amount to $700,000.

Thus, defendants argue the wrongful death awards in this matter should be reduced to $2 million dollars for each parent pursuant to the jurisprudence described above.

*Bystander Awards*

Defendants note that the only Louisiana court to confront a seven-figure bystander award reduced it by 90% on appeal. Specifically, in *Maldonado v. Kiewit Louisiana Co.*, 12-1868 (La.App. 1 Cir. 5/30/14) 152 So.3d 909, the first circuit reduced a bystander award from $1 million to $100,000 where an adult man watched his brother plunge sixty feet to his death and came upon the broken and bloody body shortly after the fall, wherein the brother succumbed to his injuries.

Defendants note that the highest bystander award to survive appellate review was only $450,000, which was awarded to a husband who witnessed grievous injury to his pregnant wife that resulted in the death of the couple's child seventeen days

8

after its birth. *Guillot v. DaimlerChrysler Corp.*, 08-1485 (La.App. 4 Cir. 9/24/10), 50 So.3d 173, *writ denied*, 11-321 (La. 3/2/11), 58 So.3d 461. Defendants note that in *Cox,* 805 So.2d 277, this court affirmed a $150,000 bystander award ($275,000 adjusted for inflation) in a case that presented similar facts and circumstances. Specifically, a mother's car was rear-ended and pushed into oncoming traffic, which resulted in the gruesome death of her eleven-year-old-daughter. The mother described "noticing 'her [daughter's] head was half-missing'" and hearing her making a gurgling sound in the daughter's final moments. *Cox*, 805 So.2d at 288.

Defendants state that there are no inflation-adjusted bystander awards that exceed the one in *Cox*; thus, the bystander awards to Jake and Katie should be accordingly reduced to $275,000 each.

*Pain and Suffering Awards*

Defendants contend that because Jake wasn't involved in the accident, his recovery should have been limited to bystander awards and mental pain and suffering included in the wrongful death awards. *See Trahan v. McManus*, 97-1224 (La. 3/2/99), 728 So.2d 1273; La.Civ.Code art. 2315.6. Particularly, Jake should not be awarded any *physical* pain and suffering damage awards, and defendants note that a contemporaneous objection is not required to preserve a challenge to a verdict form that authorizes damages that are legally unavailable. *See Berg v. Zummo*, 00-1699 (La. 4/25/01), 786 So.2d 708.

Additionally, defendants contend that Katie's injuries were minor and didn't require further treatment after the emergency room, and that comparative injuries in other cases were awarded only a few thousand dollars.

Defendants argue that the pain and suffering damages are duplicative of the damages awarded for Hayzel's wrongful death and the bystander awards. Louisiana law does not permit double recovery of damages containing the same elements.

*Kennedy-Fagan v. Estate of Graves*, 07-1062 (La.App. 1 Cir. 7/21/08), 993 So.2d 255, *writ denied*, 08-2079 (La. 11/10/08), 996 So.2d 1073. Regardless, the wrongful death and bystander awards exceed the jurisprudential ceiling for the wrongful death of a child.

Thus, defendants argue the pain and suffering awards should be accordingly reduced to $10,000 (in Katie's case) and eliminated (in Jake's case).

In summary, Defendants request this court reduce plaintiffs' wrongful death awards to $1 million each to Jake and Katie; reduce plaintiffs' bystander awards to no more than $275,000 each; vacate Jake's pain and suffering award in its entirety; and reduce Katie's pain and suffering award to no more than $10,000.

### *Plaintiffs' Arguments*

Plaintiffs argue that though damage awards in some categories exceed any previously approved amounts, the law does not automatically mandate a reduction in those awards when, considering the specific facts of this case, the jury's verdict does not "shock the conscience."

In support, the plaintiffs point to the fact that the jury "zeroed" plaintiffs in thirteen categories of damages and awarded "conservative" amounts in several categories. Plaintiffs also underscore that Cole suffered a depressed skull fracture and exhibited brain injury symptoms for six months, yet he was only award $125,000 in general damages. Furthermore, plaintiffs underscore the trial court's designation of the case as "special."

Plaintiffs note that Jake and Katie both suffer from "PTSD" and experience daily emotional turmoil and conflict. For instance, Katie enjoys spending time with her boys but feels guilty for enjoying the time with them without Hayzel; Katie wants to remember Hayzel but wants to forget the details of the accident; Katie feels overly protective and hyper-vigilant of her boys but wants them to live normal childhoods.

10

The growth and change she observes in her boys reminds her that Hayzel will "never grow up." Katie also continues to feel survivor's guilt. At trial, she disclosed that she has not changed Hazel's room because it was the "last proof that [Hayzel] was here."

Plaintiffs contend that the Louisiana Supreme Court's reasoning in *Barber Brothers Contracting Co., LLC v. Capitol City Produce Co., LLC*, 23-788 (La. 6/28/24), 388 So.3d 331, *reh'g granted*, 23-788 (La. 8/2/24), 389 So.3d 828, and *on reh'g*, 23-788 (La. 12/19/24), 397 So.3d 404, *reh'g denied*, 23-788 (La. 2/14/25), 400 So.3d 918, referred to as *Barber II*, applies to this case. In *Barber II*, the supreme court initially reduced the verdict in a car accident case (in excess of $10 million) to $5 million. On rehearing, the supreme court reversed its previous ruling reducing the total verdict and reinstated the $10 million-dollar general damages award in light of the *particular facts and circumstances of that case*, not just a review of awards from cases with similar fact patterns.

Plaintiffs underscore that a review of prior awards is only *one* factor to be considered in determining whether a particular general damage award is an abuse of discretion. Furthermore, they emphasize that reasonable people may frequently disagree whether a particular amount is appropriate. Plaintiffs contend that because a damage award is *so* fact-specific, the discretion afforded to the fact-finder's ultimate determination must be correspondingly high.

Plaintiffs concede that the award in this case is comparatively high in relation to cases that *appear* to present similar facts. However, plaintiffs argue that these cases are, in fact, distinguishable, and should not be used as a comparative metric in this matter.

Plaintiffs argue that there is ample, unrebutted evidence in the record that the family was a "picture-perfect, ideal family of five," who were "not dysfunctional or

11

broken." Plaintiffs note they presented ample evidence demonstrating the extent of the loss suffered by this family.

*Wrongful Death Awards*

Plaintiffs reject defendants' arguments that *Renfro*, *supra*, set a $2 million hard ceiling for all cases involving the death of a child. Instead, plaintiffs cite *Miller v. Gorski Wladyslaw Estate*, 338 Fed. App'x. 454 (5th Cir. 2009), a Louisiana federal jury awarded over $31 million for wrongful death and bystander awards for parents who watched their daughter die in a rear-end car crash where the occupants burned to death.[2]

Plaintiffs contend the wrongful death awards in this case do not "shock the conscience" and should be upheld.

*Bystander Awards*

Plaintiffs argue that the bystander awards were appropriate for the same reason the wrongful death awards were appropriate. Plaintiffs note that the cases cited by defendants—*Guillot*, *supra* and *Cox*, *supra*—were *affirmed* by the courts of appeal, meaning that the reviewing courts simply found no abuse of discretion. Declining to find an abuse of discretion is not the equivalent of announcing a "standard," or a hard ceiling.

Thus, plaintiffs argue the bystander awards were not an abuse of the jury's discretion and should be upheld.

*Pain and Suffering Awards*

Plaintiffs contend that the $100,000 award for Katie's physical pain and suffering should stand because the disparity between the physical suffering award

---

[2] The direct awards to the parents in this matter were not appealed.

12

($100,000) and the past and future mental and emotional suffering ($10 million total) reflects the jury's reasoned assessment of the evidence presented at trial, which showed far greater emotional and mental injury to Katie than physical injuries. Furthermore, defendants stipulated that Katie's medical bills alone at the hospital were in excess of $100,000, and thus, it is not unreasonable to award that amount for future physical pain and suffering.

For these reasons, plaintiffs contend the pain and suffering awards to Katie should stand.

However, we note that in brief and oral argument plaintiffs do acknowledge that Jake's future mental pain and suffering award should be stricken, as he was not involved in the crash and therefore not entitled to recovery on this basis. Plaintiffs note that there were many deliberations of the verdict form with the court, and the line item for Jake's future mental pain and suffering ended up on the form inadvertently. Thus, we reverse the jury's decision as to Jake's future mental pain and suffering award as stated hereinafter.

## DISCUSSION AND REVIEW

*Damage Awards*

In *Lantier v. Caskey*, 19-687, p. 8 (La.App. 3 Cir. 11/12/20), 308 So.3d 758, 766, this court summarized our appellate role in reviewing damages:

> General damages are reviewed for an abuse of discretion because the [jury] "is in the best position to evaluate witness credibility and see the evidence firsthand." *Bouquet v. Wal-Mart Stores, Inc.*, 08-309, p. 4 (La. 4/4/08), 979 So.2d 456, 459. "The role of an appellate court in reviewing a general damages award is not to decide what it considers to be an appropriate award but rather to review the exercise of discretion by the trier of fact." *Cormier v. CITGO Petroleum Corp.*, 17-104, p. 4 (La.App. 3 Cir.10/4/17), 228 So.3d 770, 776, *writ denied*, 17-2138 (La. 2/9/18), 237 So.3d 491. The trier of fact has great, even vast discretion in awarding general damages. *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257 (La.1993), *cert denied*, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).

13

Additionally, in reviewing a general damage award, "a court does not review a particular item in isolation; rather, the entire damage award is reviewed for an abuse of discretion, and if the total general damage award is not abusively high, it may not be disturbed." *Pennison*, 167 So.3d at 1078.

"General damages are inherently speculative [and] cannot be calculated with mathematical certainty[.]" *Baack*, 333 So.3d at 1214. To find an abuse of discretion, "the award or apportionment must be so high or so low in proportion to the injury or fault that it 'shocks the conscience.'" *Riley v. Maison Orleans II, Inc.*, 01-498, p. 11 (La.App. 4 Cir. 9/25/02), 829 So.2d 479, 487, "(quoting *Moore v. Healthcare Elmwood, Inc.*, 582 So.2d 871, 879 (La.App. 5 Cir. 1991))." Awards of special damages are also reviewed under the manifest error standard. *Kaiser v. Hardin*, 06-2092 (La. 4/11/07), 953 So.2d 802.

In *Pete v. Boland Marine & Manufacturing Co., LLC*, 23-170 (La. 10/20/23), 379 So.3d 636, our supreme court provided the method to review an award of general damages for abuse of discretion of the fact finder. It held that "to determine whether a trier of fact abused its discretion in its award for general damages, an appellate court is to consider the particular facts and circumstances of a case, in conjunction with a review of prior awards" and that this review "applies to claims of excessiveness as well as insufficiency in an award." *Id.* at 644. It then explained how the analysis is to be performed (emphasis added):

> We do not abandon the two-step analysis for the appellate review of a general damage award but modify the analysis as follows. The question of whether the trier of fact abused its discretion in assessing the amount of damages remains the initial inquiry. However, to evaluate this issue, an appellate court is to include a consideration of prior awards in similar cases, as well as the *particular facts and circumstances of the case* under review. If an abuse of discretion is found, the court is to then also consider those prior awards to determine "the highest or lowest point which is reasonably within that discretion." *Jones v. Market Basket Stores, Inc.*, 22-841 (La. 3/17/23), p. 16, 359 So. 3d 452 at 464.

14

*Id.* at 644.

We thus look to awards in factually similar cases in our review for abuse of discretion.

*Barber II* (which the plaintiffs cite as the controlling precedent) is a relatively recent supreme court case addressing appellate review of general damage awards. In *Barber II*, the court acknowledged its holding in *Pete*, 379 So.3d 636, (which the defendants cite as applicable precedent), but emphasized the importance of considering the unique facts and circumstances of each individual case in determining whether the general damage award "shocks the conscience" such that the jury abused its discretion:

> We granted plaintiffs' application for rehearing to reconsider our decision in *Barber Bros. Contracting Co., LLC v. Capitol City Produce Co., LLC*, 2023-00788 (La. 6/28/24), 388 So.3d 331 ("*Barber I*"), for the purpose of re-examining the general damage and loss of consortium awards, clarifying the application of *Pete v. Boland Marine and Manufacturing Company, LLC*, 2023-0170 (La. 10/20/23), 379 So. 3d 636, and correcting a scribe error in the fault assessment.

*Barber II*, 397 So.3d at 406.

In reversing its initial reduction of the general damage award, the *Barber II* court again emphasized the importance of considering the evidence presented at trial:

> We find the jury's award in this case, while on the high end of the range of reasonable awards, is not greatly disproportionate to the mass of prior awards. *Pete*, 2023-0170, p. 9, 379 So.3d at 643 (quoting *Reck v. Stevens*, 373 So.2d 498, 501 (La. 1979)). That said, as noted above, "a review of prior awards is not the only factor to be considered in evaluating whether a general damage award is an abuse of discretion; *it is a starting point*." *Id.* While considering the above-described prior awards as a touchstone, we cannot—and must not—overlook "'the facts or circumstances particular to the case under consideration.'" *Id.*, 2023-0170, p. 9, 379 So.3d at 644 (quoting *Malta*, 2021-0209, p. 32, 333 So. 3d at 408). Damage awards are evaluated, in part, by reviewing "the entirety of the evidence in [the] record, viewed in the light most favorable to the prevailing party in the trial court." *Youn*, 623 So.2d at 1261. On rehearing, we find in *Barber I*, this Court did not assign

appropriate weight to the effects of "the particular injury to the particular plaintiff under the particular circumstances[.]" *Pete*, 2023-0170, p. 9, 379 So.3d at 643 (quoting *Youn*, 623 So.2d at 1261).

The analysis in *Barber I* did not adequately account for the voluminous and largely unrebutted trial record demonstrating the particularly detrimental effect the injuries have had on Mr. Cushenberry's personality, lifestyle, identity, and self-image.

*Id*. at 415–16 (alteration in original).

Further, the supreme court acknowledged the inherent difficulty of applying such a "necessarily non-specific" and "difficult to express" appellate review standard:

"Reasonable persons frequently disagree about the measure of general damages in a particular case." *Youn v. Maritime Overseas Corp*., 623 So.2d 1257, 1261 (La.1993). "The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of a generous or stingy award." *Id*., 623 So.2d at 1261. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award." *Id.*

General damage awards must not be "obviously the result of passion or prejudice, and they [should] bear a reasonable relationship to the elements of the proved damages." *Youn*, 623 So.2d at 1261.

*Barber II*, 397 So.3d at 408 (alteration in original).

Here, like *Barber II*, the record of evidence in this case is voluminous and largely unrebutted. For example, plaintiffs submitted body cam footage of officers at the scene of the accident and at the hospital afterwards viscerally demonstrating the family's emotional state immediately following the crash. Plaintiffs also presented their own testimony regarding the accident and its aftermath, as well as the testimony of multiple other witnesses to the accident. Plaintiffs further demonstrated how the family interacted prior to Hayzel's death and their devastation afterwards. Additionally, witnesses described, and the evidence showed, via photos

and videos, how the family was still keeping Hayzel's memory alive, such as decorating her gravesite elaborately for each holiday.

*Review of Comparable/Prior Awards:*

*D*efendants argue that a verdict of this size for any injury, as to the facts of this case, automatically shocks the conscious. We disagree. Therefore, we will commence our review with a comparative analysis review as to the alleged abuse of discretion by the jury for damages awarded the plaintiffs.

The two-step process for evaluating a general damage award contained in *Barber II* is as follows: Determine whether the trier of fact abused its discretion, which is determined by (a) whether the amount "shocks the conscience" considering the facts and circumstances of that particular case and the awards in similar cases; and (b) if an abuse of discretion is found, the court then must determine the highest damage award that would be within the fact-finder's discretion using prior awards as a guide. *See Allen v. Dep't of Wildlife & Fisheries*, 24-0418 (La.App. 3 Cir. 02/05/25), 407 So.3d 23, *writ denied*, 25-290 (La. 5/29/25), 410 So.3d 145.

In *Levine v. Nationwide Agribusiness Insurance Company*, 23-488 (La.App. 3 Cir. 3/6/24), 381 So.3d 908, *writ denied*, 24-426 (La. 6/19/24), 386 So.3d 310, this court affirmed an award of $3,231,941.87 in general damages for a plaintiff who underwent three surgeries including a lumbar fusion, implantation of a spinal cord stimulator, and a shoulder surgery. At the time of trial, he was scheduled to undergo a cervical fusion, and the evidence showed he struggled with activities of daily living. He also suffered a head injury causing chronic headaches and dizziness, which would affect him for the rest of his life. He lost his job and would never again be able to work as a police officer, causing him to suffer from severe depression with suicidal thoughts. The *Levine* court found, "Based on the totality of the

17

circumstances, particularly Plaintiff's physical, mental, and life altering injuries, we cannot say that the jury abused its discretion[.]" *Id.* at 921.

Additionally, the *Levine* court went on to state the following regarding the range of awards for comparable injuries:

> Plaintiff also adjusted the damage awards in a number of factually similar cases to apply inflation and cost of living increases to calculate more accurate current-day numbers. For example, in cases involving serious cervical and lumbar injuries similar to Plaintiff's injuries, the general damage awards were adjusted to levels within the range of $1,000,000.00 to $4,400,000.00.

*Levine*, 397 So.3d at 921.

In *Pete*, the supreme court affirmed a jury verdict award of general and special damages of over $10.3 million dollars.

As cited by plaintiffs, in *Miller,* a Louisiana federal jury awarded over $31 million for wrongful death and bystander awards for parents who watched their daughter die in a rear-end car crash where the occupants burned to death. It is true that in *Miller* did not appeal the direct awards to the parents, but we still find this case relevant in a comparative review of damage verdicts.

In *Barber II*, after the supreme court initially reduced the verdict in a car accident case (in excess of $10 million) to $5 million, it reversed its previous ruling reducing the total verdict and reinstated the $10 million-dollar general damages award in light of the *particular facts and circumstances of that case*, not just a review of awards from cases with similar fact patterns.

Finally, after our comparative analysis review of these and other "similar" cases, along with the other cases listed by the parties, we note that these "comparative" cases all are distinguishable from this case on appeal as they do not provide similar particular facts. Therefore, we find these cases instructive, though not controlling.

Here, the trial court in this case, in denying defendants' JNOV, stated as follows (emphasis added):

> [T]his is a **special case with particular facts and circumstances** wherein this mother was at the scene involved in the accident; and what she had to endure there and later and is still enduring today you cannot put a price on.
>
> And the same for Jake, who runs to the scene and sees all of this, how do you put a price on what he saw? How do you put a price on a lady laying on the side of the road knowing your daughter is dead and can't move[?] . . . **This was special.**
>
> **This was a special case** and it's my finding that I know how much the jury wanted to give; is it high in our case law, yeah. . .
>
> The last four jury trials in this parish [had] astounding verdicts. . . . .
>
> I'm going to deny the Motion . . . specifically with a finding that the jury told us how much they wanted the Carmouches to have; whether they put it in the right slot or not[.]

*Review of particular facts and circumstances of this case:*

Next, in our review, we will review the record as to the particular facts and circumstances as presented by the parties and viewed by the jury, as the trier of the facts of this case, from the evidence, live testimony, demeanor of the witnesses, expert testimony, and other human interaction during this four-day trial.

*The Carmouche Family*

The record shows the Carmouche family was a family of five. It is evident from the pictures and videos entered at trial, as well as the testimony told on the stand, that Jake and Katie were loving parents and the Carmouche house was full of love and support. The testimony shows that the children loved dancing with their mom, that Jake coached the baseball and the football teams, and that they attended church together. They lived a modest life with both parents holding respectable jobs, Jake was a medic in the National Guard, and Katie was a trauma nurse at Rapides Regional Medical Center.

Additionally, the testimony showed that Hayzel was good-natured and special. The undisputed testimony and evidence showed that Hayzel loved her mother, father, and her brothers. Although Hayzel was only eight years old, she helped to take care of them. As mother and daughter, Katie and Hayzel had a special bond. They were the women of the house. Katie and Hazel had each other, mother and daughter.

Jake was not Hayzel's biological father. Katie escaped a bad relationship with Hayzel's father who had nothing to do with her. Katie met Jake and Jake adopted Hayzel, not only on paper but in his heart. Hayzel was his daughter just as much as Bennette and Cole were his sons. Although perhaps not a perfect family, the undisputed evidence showed that they were a close, happy, and loving family.

*The Accident and Immediate Aftermath*

As previously stated, this motor vehicle accident occurred shortly before 8:00 am when Katie was on her way to drop off her three children at daycare. All three children were riding in the back seats—Hayzel was eight years old, Cole was five years old, and Bennette was two years old.

While stopped in the northbound lane of Highway 1 waiting to make a left turn into the daycare facility, a cement truck rear-ended Katie's car at a high rate of speed. The impact crushed the rear of Katie's car and propelled her vehicle into the southbound lane, where it was hit once again by an oncoming Ford F-150. The damage to the car was so extensive that the back seats were forcibly shoved into the front seats and the front seats were shoved into the dashboard. The children's daycare operator witnessed the accident from the facility and immediately called Katie's husband, Jake, and had another staff member call 911. At some point after the damaged car came to a stop, Katie was able to exit the vehicle and attempted to get her children out.

Charlotte Dubroc, a retired nurse, came upon the scene and stopped to assist. Mrs. Dubroc testified at the trial and stated:

> When I get to the car, there is a mother and a child in the front seat. And two children in the back. And the little girl Hayzel has her head turned this way, eyes are closed and you have to picture the trunk of the vehicle is pushed all the way to the back seat and the back seat is pushed up all the way to the front seat. And I mean … and the back seat there maybe this much room.
>
> . . . .
>
> I don't like to think of this it's horrible. But I remember taking the child from the paramedic, bringing it and laying the child on the ground in the grass in the ditch. And then a little later there's the . . . well they get the mom out and the other child and they're laying in the ditch and the poor mother is she's hurting and the children are screaming and hollering and it's oh my God, I just I don't like to think about it.

Mrs. Dubroc further testified what she observed as to Jake at the scene of this accident, stating:

> Yes, he was, he would run back and forth. The wife and children were laying on the ground, he would run back and forth; he'd go back to the car where Hayzel was because she was still in there. And then he'd run back to where his wife and children were and he was going back and forth and he was very, very upset, very upset.

Wesley Chandler, an EMT, testified he recalled Katie "crying hysterical talking about her kids, help my kids." Chandler helped extricate Cole from the vehicle, a process that took five or six minutes because "the back seat was touching the front." Cole's condition was deteriorating and he was slipping in and out of consciousness. Chandler further testified that he heard faint moans coming from Hayzel. The jaws of life were necessary to extract Hayzel, and the medics ultimately declared Hayzel dead on the scene by yelling "black tag" at which point a tarp was put up. In his fourteen years of being a paramedic and eight years of being a cop, Chandler testified that "this was one of the worst [] crash scenes [he'd] been on."

Jake is a medic in the Louisiana National Guard at Camp Beauregard. He

described the scene as pure chaos. His wife and his two boys were lying in a ditch, and his daughter Hayzel was trapped in the car. The jaws of life were deafeningly loud. Jake testified and stated:

> "And she's pinned to the back of the passenger front seat. Not awake, not moving. So I like I literally ripped the front seat apart, but I can't rip the frame of the seat apart. So I can't get her out."

Jake further described putting "leads" on his daughter, attempting to find a heartbeat and realizing her heart had stopped.

Katie Carmouche testified and relived the aftermath of this horrific accident at trial:

> I laid down and then I was unable to get back up. You know part of me wanted to be stuck right there on the ground while my child was still in that car. I just left her there. And so about that same time they laid Cole next to me, but they wouldn't let me move my head. So I could just hear everything going on around me but I couldn't look. Like I could just look up like, but I could hear. And I am a nurse so I could hear Cole going in and out. Hey buddy, hey buddy you have to wake up. And I knew what that meant, like I saw his head bleeding in that car and I heard them like he was going in and out and I understood what can happen there. . . .
>
> And that same time in that time frame that was when Jake came. I don't know how long he had been there but that was the first time I saw him because like I said I couldn't get up, I couldn't look around, I couldn't see. But Jake knew me and I was like she's still in the car. . . I know that my baby is still in that car. And so he went back and when he did, he went back and forth several times and then at that point the EMT whoever kept asking about medical history for Cole and Bennette and their allergies and I was just struggling . . . and (INAUDIBLE SOBBING CRYING) and no one was asking about her past medical history. And no one was asking about her allergies. And Jake came back . . . he came back and I saw it on his face. And I said no, no, no. . . . my child was dead while I was there . . . And I couldn't see her. I had to leave her there that was very significant and we just left her there. This was my little girl, and I just left her there.

It is also important to note that Katie, as an RN and Jake, as a medic, knew the medical language and codes used by the medics and ENT personnel as to severity of the injuries to their sons and as to Hayzel's injuries and resulting demise. Additionally, the record shows that the jury viewed brief clips of body camera

22

footage of the scene and brief clips of body camera footage at the hospital, as to this accident, aftermath, and injuries.

*Physical and Mental Injuries:*

The surviving Carmouche family members, Katie, Cole, and Bennette, were transported to Rapides Regional Medical Center for treatment. The record shows Bennette had a broken tibia and fibula. He was in a long-leg cast and non-weightbearing for months. Dr. Jillian Ploof testified that Cole sustained a "severe traumatic brain injury" - an open depressed skull fracture with underlying subdural hematoma. Cole was transferred by helicopter for treatment of his injuries to Our Lady of the Lake in Baton Rouge along with his babysitter, Heidi Marcotte, who volunteered because no family member was able to physically go with him.

The head of the trauma team at Rapides Regional Medical Center, Dr. Samantha Zeringue, medical records were introduced as to the injuries and treatment of the Carmouche family. Dr. Zeringue's records reflect that Katie was bruised and hurting from head to toe and had contusions to her pelvis and foot. Dr. Zeringue also recalled Katie grabbing her arm and desperately crying out "They made me leave her there." Her survivor's guilt was evident: "it should have been me."

The jury also saw Katie's condition after the crash from body camera footage from Rapides Regional Medical Center, authenticated by Trooper Coghlan.

Katie, Cole, and Bennette's medical records were introduced by plaintiffs and reviewed by the jury. Defendants note in their brief to this court that they stipulated $457,826.72 in special damages for plaintiffs, which include items such as funeral expenses and certain medical bills incurred by the family.

Additionally, the undisputed evidence shows that Jake and Katie both suffer from "PTSD." Psychiatrist Dr. Jessica Boudreaux testified Katie is conflicted daily: between wanting to remember Hayzel but not wanting to relive the horrific crash;

23

wanting to be grateful her boys are still with her, while feeling guilty for enjoying her boys without her daughter and feeling overly protective and hypervigilant.

*Jury Verdict and Awards:*

Although generally the general damage awards should be assessed in their entirety and considered as a whole, we will now address each assignment of error individually.

The definition of general damages and what items should be considered in assessing general damages was set forth in *Morgan v. Willis-Knighton Medical Center*, 456 So.2d 650, 658 (La.App. 2 Cir.1984), as "those which may not be fixed with pecuniary exactitude; they instead involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification, or physical enjoyment, or other losses of life or lifestyle which cannot be definitively measured in monetary terms." *See also Sayre v. PNK (Lake Charles), LLC*, 15-859 (La.App. 3 Cir. 3/23/16), 188 So.3d 428, *writ denied*, 16-696 (La. 6/28/16), 192 So.3d 780. General damages "are inherently speculative in nature and cannot be fixed with mathematical certainty." *Bourg v. Cajun Cutters, Inc.*, 14-210, p. 21 (La.App. 1 Cir. 5/7/15), 174 So.3d 56, 70, *writs denied*, 15-1253, 15-1306 (La. 4/4/16), 190 So.3d 1205, 1201.

"In the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." La.Civ.Code art. 2324.1. Since the trier of fact "is in the best position to evaluate witness credibility and see the evidence firsthand, it is afforded much discretion in independently assessing the facts and rendering an award." *Bourg*, 174 So.3d at 70.

"Reasonable persons frequently disagree about the measure of general damages in a particular case." *Youn*, 623 So.2d at 1261. An appellate court should only increase or decrease a general damages award when it is "beyond that which a

24

reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." *Id.*

*Wrongful Death Awards*

"Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *McGee v. A C and S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775. Loss of enjoyment of life is defined as "detrimental alterations of the person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed before the injury." *Id.*

Louisiana Civil Code Article 2315.2 permits designated family members to bring suit "to recover damages which they sustained as a result of the death" when a person dies due to another's fault. "'Elements' used to determine wrongful death awards can include 'loss of love and affection, loss of services, and loss of support.' *Turner v. Lyons*, 03–0186, pp. 11–12 (La.App. 4 Cir. 1/28/04); 867 So.2d 13, 21." *Norfleet v. Lifeguard Transp. Serv., Inc.*, 05-501, p. 11 (La.App. 4 Cir. 5/17/06), 934 So.2d 846, 855.

Here, the Carmouches were awarded a total of $20 million for Hayzel's wrongful death ($15 million to Katie; $5 million to Jake). Defendants argue that the amount should be no more than $1 million to each parent ($2 million total). Defendants contend that *Renfro, supra.*, set a $2 million dollar ceiling. However, we note that *Renfro*, was decided in 2016.

As stated above, the jury in *Miller, supra*, a jury awarded over $31 million to parents who witnessed the death of their daughter in a fiery car crash.

In *Stauder v. Shell Oil Co.*, 22-593 (La.App. 4 Cir. 06/03/24), 409 So.3d 1, two adult daughters each received a wrongful death award in excess of $2 million dollars (i.e. over $4 million total) for the death of their father from mesothelioma.

25

While noting that the verdict in similar cases generally ranges from $500,000 to $750,000, the Louisiana Fourth Circuit declined to reduce the award because the *particular facts and circumstances* of the case supported the deviation.

Here, the record shows that Jake and Katie both suffer from "PTSD" and experience daily emotional turmoil and conflict. The undisputed medical testimony shows that both Jake's and Katie's PTSD are permanent and thus, they will suffer from this resulting injury for their entire lives. Psychiatrist Dr. Jessica Boudreaux testified Katie is conflicted daily: between wanting to remember Hayzel, but not wanting to relive the horrific crash; wanting to be grateful her boys are still with her, while feeling guilty for enjoying her boys without her daughter; and feeling overly protective and hypervigilant about her boys but wanting them to be able to live normal childhoods. Katie continues to feel guilt that she survived and Hayzel did not. She also struggles seeing her boys getting older because she knows her daughter "will never grow up."

Katie testified and admitted the wreck changed her as a parent and changed her relationship with her boys and Jake. Katie deals with conflicting emotions daily. She wants her sons to live fulfilling lives but feels the need to overprotect them. She wants to enjoy making memories with her sons, but feels guilty Hayzel is not able to do so.

Although Jake was used to emergency situations as a medic, Dr. Boudreaux noted "obviously it's different when it's your daughter." Of Jake's prognosis, Dr. Boudreaux testified:

> Yes, he'll always have some symptoms of the PTSD, the flashbacks at times. And you know again as the kids get older there will always be memories of how old Hayzel would be at that time, like she'd be 12 years old today, those kind of things, there will always be those memories, those events, the milestones that they won't be able to have with her.

In addition to Dr. Boudreaux's testimony, the jury had the benefit of Dr. Boudreaux's detailed session notes introduced into evidence.

Katie's best friend, Brooke Carter, testified about the closeness of Katie's and Jake's relationship with Hayzel. Mrs. Carter described Katie as "an amazing mom." She further testified that as of the time of trial, Katie had not changed Hayzel's room since her death because she feels like "that's the last thing that she . . . the last proof she was here."

After review of the particular unique facts of this case, along with the jurisprudence, we find the record contains sufficient evidence to support the jury's findings and its award(s) of wrong death damages to Katie and Jake. Therefore, we do not find that the wrongful death awards in this case, with the special particular facts and circumstances, "shock the conscience;" and we do not find that the wrongful death damage award is so high compared to similar cases as to be an abuse of discretion. This assignment of error is without merit.

*Bystander Damage Awards*

Bystander claims compensate persons forced to observe a traumatic event (or come upon the scene shortly thereafter) that causes severe harm to a loved one. *Castille v. Med. Mut. Ins. Co.*, 14-519 (La.App. 3 Cir. 11/05/14), 150 So.3d 614.

In this case, the jury awarded $3 million to Jake and $1 million to Katie in bystander damage awards. A review of the record shows that these plaintiffs/parents were active participants in this horrific accident and aftermath, and that they didn't simply witness Hayzel's fatal injuries and resulting death at the scene of this accident. Katie was driving the car when this motor vehicle accident took place, and Jake was unable to free Hayzel from the crushed wreckage of the car.

Additionally, Jake was in the process of assisting the first responders with a defibrillator on Hayzel in an attempt to save her while the "jaws of life" was being

27

used to extract her when he was informed that she had succumbed to her severe injuries. Finally, undisputed expert testimony established that Jake's and Katie's diagnoses of "PTSD" stem from witnessing the crash and its aftermath, and that these afflictions will be permanent.

We note that in *Guillot*, *supra*, and *Cox*, *supra*, the general damage awards were *affirmed* by appellate courts, finding that the jury did not abuse its discretion in awarding a certain amount and does not function as a standard or hard cap by which to measure other damage awards. In other words, damage awards are not standardized for particular types of injuries, and the awards must be based on the particular individual facts of each case.

Furthermore, as previously stated, in *Miller, supra,* a Louisiana federal jury awarded over $31 million for wrongful death and bystander awards for parents who watched their daughter die in a rear-end car crash where the occupants burned to death.

After review of the record, we find the bystander damage awards to Jake and Katie, who were active participants and witnesses in the fatal crash and its aftermath, are supported by the record, do not "shock the conscience," and are not out of step with damage awards in similar cases. Thus, we do not find that the jury abused its discretion in its bystander awards to Jake and Katie in this case with these particular special facts and circumstances.

*Pain and Suffering Awards*

"Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *McGee v. A C and S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775.

As previously stated, this court has explained the "pain and suffering" general damage category as follows:

> Pain and suffering, both physical and mental, refers to the pain, discomfort, inconvenience, anguish, and emotional trauma that accompanies an injury." *McGee v. A C and S, Inc.*, 05-1036, p. 5 (La. 7/10/06), 933 So.2d 770, 775. Loss of enjoyment of life is defined as "detrimental alterations of a person's life or lifestyle or the person's inability to participate in the activities or pleasures of life that were formerly enjoyed before the injury. *Id*.

*Allen*, 407 So.3d at 35–36.

We will first examine Katie's award. The jury awarded Katie $3 million in future mental pain and suffering, $7 million in past mental pain and suffering, and $100,000 in physical pain and suffering.

We note that Louisiana provides for three separate and distinct categories of possible damage for suffering mental pain and suffering, i.e. a plaintiff's own mental pain and suffering, along with bystander's or wrongful death mental pain and suffering, such as we have before us in this matter.

Here, and as to Katie's *own* future and past mental pain and suffering, as proven to have been suffered as to these facts and circumstances, this category covers the additional separate harm that the jury found was caused to her that does not result from the immediate trauma from experiencing the crash and its aftermath (such as bystander award) and/or the loss of Hayzel's love and affection (such as wrongful death).

Thus, we find that this award is meant to cover the remaining categories of damage and harm, as found by the jury, such as Katie's *survivor's guilt*, as well as the changed relationship with her boys as a result of the accident, thus are not covered by bystander or wrongful death awards. Additionally, this award also covers the traumatic and mental stress that Katie continues to experience as a result of her own physical pain and suffering. Therefore, we find that as to the particular and special facts of this case, these damages for Katie's past and future mental pain

29

and suffering are distinct and separate, and not duplicative of wrongful death or bystander awards.

Additionally, and with regards to all categories of the general damage awards, the trial court specifically noted that the verdict amount was not exorbitant compared to others recently awarded in that parish. Furthermore, as stated above, the trial court very specifically underscored multiple times in his oral remarks denying defendants' JNOV that this case was "special" as to the specific facts of this motor vehicle accident, stating, in pertinent part:

> "This is a special case and it's my finding that I know how much the jury wanted to give; is it high in our case law, yeah . . . Juries even in this conservative parish obviously have a high value on life. I do too. You really can't put a price on it."

We agree, and as noted hereinabove, we find that the plaintiffs presented sufficient evidence to show that this case was in fact "special" as to the unique and particular facts and circumstances in this matter.

Additionally, this award is not unprecedented, as similar (or higher) verdicts have been awarded in other cases in the state. *See Miller*, *supra*. Therefore, we do not find that the pain and suffering awards to Katie in this case with its particular special facts and circumstances "shock the conscience," and we do not find that the pain and suffering awards are so high compared to similar cases as to be an abuse of discretion. Thus, we find the jury did not abuse its discretion in Katie's pain and suffering award.

However, while we find the awards to Katie accords with the evidence in the record and satisfies a comparative jurisprudential review, the award to Jake does not.

The jury awarded Jake $250,000 in future pain and suffering, which both parties agree was in error. Because Jake was not involved in the crash and did not sustain any injuries, we find the jury abused its discretion by awarding Jake

30

$250,000 in future pain and suffering. Thus, we vacate this award of $250,000 to Jake in future pain and suffering and reverse that limited part of the trial court's judgment.

Finally, and although the Defendants did not specifically state these jury awards were a result of a "run away" jury, their arguments seem to characterize this jury as emotional and jotting down excessive amounts of damages as a result of passion or prejudice. After review, we find this is clearly not the case. The jury verdict sheet reflects its multiple denials of several of plaintiffs' other demands for damages.

Moreover, the jury's verdict for some awards is at the lower end of an appropriate range of damages. For example, the undisputed evidence shows Cole suffered a depressed skull fracture and exhibited brain injury symptoms for over six months, yet the jury's award was $125,000. Finally, the jury denied Katie and Jake damages for Hayzel's survival action, although there was testimony from the EMT, Chandler, that he heard "faint moans coming from Hayzel" post-accident. Thus, this jury could have reasonably found plaintiffs entitlement to survival damages, they chose to deny those claims. These indicate that the jury's verdict was a result of their careful and thorough deliberation, and that their verdict was rendered in accordance with the particular facts and circumstances of this case.

In summation, hereinabove we reviewed the damage awards for wrongful death, and bystander damages for Katie and Jake, and pain and suffering for Katie, and we find the record supported the jury's findings and awards.

## CONCLUSION

In conclusion and considering the well-documented facts and circumstances particular to this case, in conjunction with a review of prior similar awards, we cannot conclude that "a rational trier of fact could not have fixed the awards of

31

general damages at the level set" by this jury. *Youn,* 623 So.2d at 1261. We find the jury's general damages award was not "the result of passion or prejudice," but rather bore a reasonable relationship to the damages which are supported in the evidence presented at trial. *Id.* Additionally, while the verdict awarded to plaintiffs is on the higher end of damage awards in similar cases, we do not find that it is so high as to "shock the conscience." Further, we find, as the jury did (as evidenced by the verdict), this to be a case with special particular facts and circumstances. As such, we find that the jury did not abuse its great discretion in the general damage awards, when viewed as to the unique and special facts of this case.

However, we find that the jury did abuse its discretion by awarding Jake $250,000 for pain and suffering.

## DECREE

Defendants, Bayou Ready Mix, LLC, Gene Lemoine, and National Union Fire Insurance Company of Pittsburgh, PA, raise three assignments of error. We affirm the trial court's judgment relative to the damage awards to the plaintiffs, Jake Carmouche and Katie Carmouche, individually and on behalf of their sons, Cole and Bennette Carmouche. However, we vacate and reverse the trial court's judgment as to the award of $250,000 to Jake Carmouche for future pain and suffering.

Costs of these proceedings are assessed to defendants, Bayou Ready Mix, LLC, Gene Lemoine, and National Union Fire Insurance Company of Pittsburgh, PA.

**AFFIRMED IN PART; AND REVERSED IN PART.**

32